**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| AURORA LERMA, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:16-CV-01281 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| ACTING COMMISSIONER OF | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On July 12, 2016, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment under 28 U.S.C. § 636(c). (Docket Entry #9). The case was then transferred to this court. Cross-motions for summary judgment have been filed by Plaintiff Aurora Lerma ("Plaintiff," "Lerma"), and by Defendant Nancy A. Berryhill ("Defendant," "Commissioner"), in her capacity as Acting Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment, Docket Entry #13; Plaintiff's Brief in Support of Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #14; Defendant's Motion for Summary Judgment, Memorandum in Support of Defendant's Cross Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #12). Defendant has responded. (Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry #15). After considering the pleadings, the evidence submitted, and the applicable law, it is ORDERED that Defendant's motion is GRANTED, and that Plaintiff's motion is DENIED.

**Background**

On February 1, 2013, Plaintiff Aurora Lerma filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). (Administrative Transcript ["Tr."] at 202-09). On February 18, 2013, she filed an application for Supplemental Security Income ("SSI") benefits, under Title XVI of the Act. (Tr. at 210-15). Lerma claimed that she had been unable to work since January 1, 2007, due to high blood pressure, high cholesterol, diabetes, anxiety, depression, and insomnia. (Tr. at 202, 229). On July 17, 2012, the Commissioner denied her applications for benefits. (Tr. at 8, 46-47, 103-10). Plaintiff petitioned for a reconsideration of that decision, but her applications were again denied, on November 5, 2013. (Tr. at 97-98, 111-15, 123-28).

On November 20, 2013, Lerma successfully requested a hearing before an administrative law judge ["ALJ"]. (Tr. at 116-20). That hearing, before ALJ Thomas Norman, took place on September 23, 2014. (Tr. at 25-45). Plaintiff appeared with her attorney, Patricia Olivares ["Ms. Olivares"], and she testified in her own behalf. (Tr. 27-40). The ALJ also heard testimony from Mr. Herman Litt, ["Mr. Litt"], a vocational expert witness, and Dr. Nancy Tarrand ["Dr. Tarrand"], a medical expert. (Tr. at 40-44).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.    An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

5.      If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Lerma has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming SSI benefits under the Act has the burden to prove that she suffers from a disability. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan*, 38 F.3d at 236 (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Plaintiff has not "engaged in substantial gainful activity" since January 1, 2007.[1] (Tr. at 10). The ALJ further concluded that Lerma suffers from degenerative joint disease in her right knee, major depressive disorder, post-traumatic stress disorder, diabetes, hypertension, and morbid obesity. (*Id*.). Although he determined that these impairments are severe, he concluded, ultimately, that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.[2] (Tr. at 11). He also found that Plaintiff's

---

[1] The ALJ noted that Plaintiff maintains part-time employment, but found that her earnings do not rise to the level of substantial gainful activity. (Tr. at 10). He also noted that, although Plaintiff alleged a disability onset date of January 1, 2007, the earliest medical records are dated July 6, 2010, which precludes a disability finding prior to that date. (Tr. at 11).

[2] A claimant is presumed to be "disabled" if her impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

medically determinable hepatic lobe[3] mass, gallstones, and hyperlipidemia[4] are not severe impairments, because the medical records showed that neither the liver mass, nor the gallstones, affected her ability to work. (*Id.*). The ALJ then assessed Lerma's residual functional capacity ("RFC"), and found that:

> The claimant has the [RFC] to perform light work[,] as defined in 20 CFR [§§] 404.1567(b) and 416.967(b)[,] [with an ability to] lift and carry 20 pounds occasionally and 10 pounds frequently[,] sit for about six hours out of an eight-hour workday[,] and stand and walk for six hours out of an eight-hour workday[,] except she cannot climb ladders[,] ropes[,] or scaffolds. She can occasionally climb ramps and stairs[, as well as] kneel and crawl. [She] can understand, remember, and carry out simple instructions; make simple work-related decisions; and respond appropriately to supervis[ors], co-workers, [the] public and [typical] work situations. She is able to handle changes in [her] work routine [] and [maintain] concentrat[ion] for extended periods.

(Tr. at 13). Based on the medical records, and the testimony from Mr. Litt and Dr. Tarrand, the ALJ determined that Lerma is capable of performing her past relevant work as a sales attendant. (Tr. at 16). For that reason, the ALJ concluded that Plaintiff is "not [] under a 'disability,' as defined in the Act," and he denied her applications for benefits. (Tr. at 17).

On January 8, 2015, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 22). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On March 10, 2016, the Appeals Council denied her request

---

[3] The "hepatic lobes" are the large divisions of the liver: caudate, quadrate, left, and right. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 752 (5th ed. 1998).

[4] "Hyperlipidemia" is an excessive level of blood fats, which is usually caused by a lipoprotein lapse deficiency or a defect in the conversion of low-density lipoprotein to high density lipoprotein. *Id.* at 791.

for review, concluding that no reason for review existed under the regulations. (Tr. at 1-4). With that

ruling, the ALJ's findings became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2). On

May 3, 2016, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended

at 42 U.S.C. § 405(g)), to challenge that decision. (Docket Entry #1). Subsequently, the parties filed

cross-motions for summary judgment. Having considered the pleadings, the evidence submitted, and

the applicable law, it is ordered that Defendant's motion is granted, and that Plaintiff's motion is

denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain

whether the final decision is supported by substantial evidence and whether the proper legal

standards were applied. *See Randall v. Astrue*, 570 F.3d 651, 655 (5th Cir. 2009); *Newton*, 209 F.3d

at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings

are supported by substantial evidence, they must be affirmed." *Id.* "'Substantial evidence is more

than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as

adequate to support a conclusion.'" *Randall*, 570 F.3d at 662 (*quoting Randall v. Sullivan*, 956 F.2d

105, 109 (5th Cir. 1992)); *accord Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). On review, the

court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it

contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d

558, 564 (5th Cir. 1995); *see Randall*, 570 F.3d at 662; *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir.

2000). In making this determination, the court must weigh the following four factors: the objective

medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact;

Plaintiff's own testimony about her pain; and Plaintiff's educational background, work history, and

6

present age. *See Wren*, 925 F.2d at 126. If there are no credible evidentiary choices or medical findings that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

## Discussion

Before this court, Plaintiff challenges the Commissioner's finding that she is not disabled under the Act. In support of her argument, she claims that the ALJ erred at step four of his analysis. Lerma complains, specifically, that the ALJ failed to make findings of fact regarding the physical and mental demands of her past work as a sales attendant. (Plaintiff's Motion at 5–6). She also alleges that the ALJ failed to ask the vocational expert witness if his testimony was consistent with the Dictionary of Occupational Titles ["DOT"]. (*Id*. at 7-8). Next, Plaintiff contends that she cannot perform her past work, as it is generally performed, because she cannot meet the standing, walking, or mental requirements of a "sales attendant," as the position is described in the DOT. (*Id*. at 8-10). Finally, Plaintiff claims that the ALJ failed to consider a letter from her part-time employer, which states that she is able to work only because of an accommodation. (*Id*. at 11-12). Defendant, however, maintains that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Lerma is not disabled under the Act, and that she is not entitled to an award of Social Security Income benefits. (Defendant's Motion at 5-8, 9-11).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical records show that Plaintiff was treated at Harris Health System's Martin Luther King Jr. Health Center ["MLK Center"] between July 6, 2010, and March 13, 2013. (Tr. at 257-345). On July 6, 2010, Plaintiff complained that she had been suffering from depression,

following the deaths of several family members. (Tr. at 341). She reported symptoms including fatigue and insomnia, but she denied having any suicidal or homicidal ideation. (*Id.*). She also reported that she had been diagnosed as suffering from diabetes. The physician reviewed a computerized tomography ["CT"] scan[5] of Lerma's abdomen, which revealed hepatosplenomegaly[6] and hepatic steatosis.[7] (Tr. at 342). He found an irregular hypoechoic area in the left lobe of the liver, a hydropic[8] gall bladder, with a small amount of sludge, and a hemangioma[9] on the liver. (Tr. at 345). The scan was otherwise unremarkable. (Tr. at 344-45). The physician recommended that Plaintiff begin behavioral therapy to treat her depression, undergo additional testing of her liver mass, and consult a gastrointerologist. (Tr. at 342).

On July 15, 2010, Lerma returned to the MLK Center for a diabetes assessment. (Tr. at 336-38). Her physician prescribed Metformin to control her glucose levels. (Tr. at 336-38). On July 26, 2010, she reported that her symptoms had not changed since the last visit. (Tr. at 333). Plaintiff stated that she had not yet sought treatment from a gastrointerologist or a psychologist. (Tr. at 334). She was encouraged to see those physicians, as well as a podiatrist and an opthamologist, and to return in three months. (Tr. at 334, 335). On September 3, 2010, Lerma stated that her blood sugar had been as high as 200 milligrams per deciliter of blood ["mg/dl"]. (Tr. at 436). However, she

---

[5]A "computerized tomography scan" is a radiographic technique that produces a film that represents a detailed cross section of tissue structure. *Id.* at 378.

[6]"Hepatosplenomegaly" is the enlargement of the spleen and liver. *Id.* at 754.

[7]"Hepatic steatosis" is the accumulation of fat in the liver. It is commonly referred to as "fatty liver disease." *Id.* at 751.

[8]"Hydropic" pertains to an abnormal accumulation of clear watery or serous fluid in the body tissue or cavity, such as a joint, a fallopian tube, the abdomen, the middle ear, or the gallbladder. *Id.* at 784.

[9]A "hemangioma" is a benign tumor consisting of a mass of blood vessels. *Id.* at 740.

added that her blood sugar had been as low as150 mg/dl. (*Id.*). Plaintiff also said that she had stepped on a nail in February, and had received a tetanus shot. (*Id.*).

On September 14, 2010, Lerma received additional treatment at the MLK Center. (Tr. at 324-27). She stated that she was post-menopausal, but reported occasional vaginal spotting. (Tr. at 325). She also complained of back pain, which she attributed to the size of her breasts. She was counseled to lose weight, or to undergo a breast reduction surgery. (*Id.*). Her physician ordered an abdominal and pelvic ultrasound to further evaluate her vaginal bleeding. (Tr. at 327). Those images, dated November 3, 2010, revealed a small hiatal hernia[10] in the lower thorax, and mild diffuse hepatic steatosis. (Tr. at 321). The liver mass had not changed since the scan taken on July 10, 2010. (*Id.*). The images also showed a right inguinal hernia[11] in the gatrointestinal tract, and an enlarged, multifibrous uterus. Plaintiff's spleen, pancreas, adrenal glands, kidney, bones, and soft tissues were unremarkable. (*Id.*). A CT scan and MRI of those areas returned identical results. (Tr. at 317-18, 320).

On February 1, 2011, Plaintiff had another appointment at the MLK Center. (Tr. at 414-16). Lerma said that she had been monitoring her cholesterol, but that she needed a nutritionist's assistance. (Tr. at 415). She stated that she had "been doing well" with her diabetes, and that she had sought treatment from an opthalmologist. However, she had not yet consulted a podiatrist. (*Id.*). Plaintiff reported a persistent cough, but she denied any headache, chest pain, dyspnea,[12] abdominal

---

[10]A "hiatal hernia" is a protrusion of a portion of the stomach upward through the diaphragm. *Id.* at 761. Most people display few, if any, symptoms. *Id.*

[11]An "inguinal hernia" is a hernia in which a loop of intestine enters the inguinal canal. *Id.* at 839. It is typically repaired surgically to prevent the herniated segment from becoming strangulated, gangrenous, or obstructive. *Id.*

[12]"Dyspnea" is a distressful sensation of uncomfortable breathing that may be caused by certain heart conditions, strenuous exercise, or anxiety. *Id.* at 527.

pain, dizziness, nausea, or vomiting. The physician referred Lerma to a nutritionist, and instructed her to follow-up in three months (Tr. at 415-16).

On March 18, 2011, Plaintiff presented to the MLK Center for a psychiatric consultation. (Tr. at 411). She complained of depression, beginning in 2007, with the death of her son, as well as a recent onset of anxiety and insomnia. (Tr. at 411, 412). Lerma was diagnosed as suffering from depression and anxiety. The physician prescribed Ambien, to treat her insomnia, and referred her to a psychiatrist for further assessment of her depression. (*Id*.). He also instructed her to return in two months, if her symptoms persisted or worsened. (Tr. at 413).

One year later, on March 23, 2012, Lerma returned to the MLK Center, with complaints of pain and swelling in a tooth in her lower right jaw. (Tr. at 404). She said that she had not experienced any headache, or difficulty in breathing or swallowing. Her physician prescribed Amoxicillin to treat the infection in her tooth, and he instructed her to see a dentist. (Tr. at 405). He also ordered a metabolic blood panel, which showed that her blood glucose and urea nitrogen levels were elevated. (Tr. at 402). On May 30, 2012, Plaintiff received follow-up treatment for her diabetes. (Tr. at 394-96). She reported a history of depression, diabetes, hyperlipidemia, and hypertension. (Tr. at 395). She denied experiencing any burning, numbness, pins and needles, tingling, weakness or cramping in her feet. (*Id*.). The physician found no abnormalities of Lerma's feet. (Tr. at 396). He instructed her to inspect her feet every evening, and to return in one year. (*Id*.).

On August 30, 2012, Plaintiff returned to the MLK Center for lab testing to monitor her diabetes, an abdominal MRI, and to discuss her stress level. (Tr. at 390-92). She said that her average blood sugar was about 120 mg/dl. (Tr. at 390). She also stated that she had been having trouble sleeping, and that she became depressed after her mother's death earlier that month. (*Id*.).

Lerma told her physician that she is 75% compliant with her medication and diet, and that she regularly monitors her glucose level. The physician noted that her A1C level[13] at that visit fell within the targeted range. However, Lerma's blood pressure and cholesterol levels were elevated, and she displayed a blunted affect, and cried during the examination.(*Id*.). The physician instructed Lerma to modify her diet by limiting her consumption of saturated fats, trans fats, and carbohydrates, and to exercise three times a week. (Tr. at 391). He then prescribed urea nitrogen, to treat her hypertension, and Paxil to treat her insomnia and anxiety. (*Id*.).

On January 9, 2013, Lerma had another appointment at the MLK Center to assess her diabetes, hypertension, and depression. (Tr. at 384-87). She complained of persistent depression, which worsened around the holidays. (Tr. at 384). Plaintiff explained that the incarceration of her two sons had exacerbated her depression, as well. She stated that she sometimes had difficulty completing her normal activities, and that her depressive episodes can persist for several days. Lerma also said that her blood pressure and diabetes had been stable on her current medication. (*Id*.). She denied experiencing any chest pain or dyspnea. The physician noted no physical abnormalities or deficits during the examination. (Tr. at 384-85). She appeared slightly depressed, but she was able to remain calm. (Tr. at 385). She was instructed to return for another follow-up in one month, and to bring all of her medications to that appointment. (Tr. at 386).

On February 7, 2013, Lerma presented with blood in her stools and hemorrhoids. (Tr. at 380). She denied any abdominal pain, headache, dizziness, nausea, vomiting, pain in her legs, dyspena, or fatigue. (*Id*.). Plaintiff's blood pressure was normal, but her cholesterol level was

---

[13]The A1C test is a blood test that provides information about an individual's average levels of blood glucose over the past three months. THE NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES, https://www.niddk.nih.gov/health-information/diabetes/overview/tests-diagnosis/a1c-test (last visited June 5, 2017).

elevated. (Tr. at 381). The physician ordered a metabolic panel, which showed that Plaintiff's glucose and A1c levels were elevated, as well. (Tr. at 378). He instructed Lerma to see a nutritionist, to address her high cholesterol, and a psychiatrist, to treat her depression. (Tr. at 381).

On March 1, 2013, Plaintiff was treated at the MLK Center for an eye injury that she sustained when she "hit herself [] with an aloe vera plant." (Tr. at 359). She reported that the redness in her eye had improved, but complained of pain inside of her eye. (*Id.*). She stated that, following the injury, she noticed blood and felt pain. She rated the pain as a one or two, on a scale of one to ten. (*Id.*). She did not report any other physical ailments, and her affect, mood, judgment and thought content appeared to be normal. (Tr. at 359-60). She was advised to report to the emergency room, for further treatment for the eye injury, and to return to the clinic in three months to follow-up on her diabetes. (Tr. at 360).

On May 20, 2013, Lerma presented to the MLK Center for a psychiatric evaluation. (Tr. at 352-56). Plaintiff reported that she had been feeling increasingly depressed since 2007. (Tr. at 353). She stated that she cries continuously, and that she feels that "life isn't worth living." (*Id.*). She also complained of difficulty in sleeping, fatigue, and anorexia. She said that she had been taking Paxil, to treat her depression, and Ambien to treat her insomnia, but that they had not been effective. She denied experiencing any suicidal or homicidal ideations. (*Id.*). Lerma reported symptoms of depression, including crying spells, anhedonia, guilt, hopelessness, and worthlessness. (*Id.*). She also reported symptoms of anxiety, including excessive worry, ruminating thoughts, an inability to relax, and "feeling on edge." (*Id.*). The physician diagnosed Plaintiff as suffering from insomnia and

depression, and assigned her a global assessment function ["GAF"] score of 55.[14] (Tr. at 352, 356). He prescribed Trazodone to treat her insomnia, referred her to behavioral therapy, and instructed her to return in six to eight weeks. (Tr. at 352, 356).

Plaintiff presented to Dr. Afroz Shamim ["Dr. Shamim"], a psychiatrist at the MLK Center, on July 26, 2013. (Tr. at 453-59). Lerma reported that she "visualiz[es] her [deceased] son when [she] close[s her] eyes[,]" and that she sets a plate for him at the dinner table. (Tr. at 454). She stated that she had been prescribed Trazodone, to help her sleep, and Paxil, to treat her depression. (Tr. at 453-54). Lerma estimated that her symptoms of depression had improved by about twenty percent, but that she continued to struggle with insomnia. (Tr. at 454). She explained that, at times, she was so drowsy that she performed poorly at work. The psychiatrist increased the dosage of Plaintiff's Trazodone and Paxil prescriptions, and prescribed Hydroxyzine, to treat her insomnia and anxiety. (Tr. at 458). He also discussed the importance of diet, exercise, and participating in structured activities. (Tr. at 457). He then instructed Plaintiff to return in six weeks. (Tr. at 458).

On September 5, 2013, Lerma presented to Dr. Amin Karim ["Dr. Karim"], a cardiologist acting on behalf of the state, for a disability evaluation. (Tr. at 462-68). During the examination, Plaintiff was able to walk around the room without assistance. (Tr. at 462). She reported that, in 2005, she had slipped at work, and injured the ligaments in her knee. She stated that she had seen an orthopedist, and had been told that she may need a "knee joint replacement." (*Id*.). Lerma told

---

[14]The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. *See id.* A GAF score in the "51 to 60" range indicates moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers) OR moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks). *Id.* at 34.

Dr. Karim that she is able to walk, work, drive, and perform chores. She added that she is able to stand for about four hours, but that, after six hours, her knee begins to hurt "badly." (*Id.*). Plaintiff reported experiencing cardiovascular and musculoskeletal symptoms, including dyspnea on exertion, dizziness, high blood pressure, stiff muscles, morning stiffness, and back pain. (Tr. at 463). She stated that she had difficulty relaxing, sleeping, and remembering things; that she became stressed or worried easily; and that she had been feeling lonely and depressed. (*Id.*). Dr. Karim observed no swelling or tenderness of the knees, and he noted that she displayed a full range of motion in those joints. (Tr. at 462, 464, 465). He also saw that she was able to raise each leg to ninety degrees. (Tr. at 464). However, she did complain of some pain in her left knee, with movement. (Tr. at 465). Her gait was normal, but she was unable to tip toe or to walk on her heels. She was able to hop once, and perform a squat. (*Id.*). An x-ray of Lerma's right knee, dated September 5, 2013, showed joint space narrowing and osteophyte formation, involving the medial, lateral, and patellofemoral joint compartment. (Tr. at 461). The image also showed small joint effusion. (*Id.*). Dr. Karim determined that Plaintiff was suffering from osteoarthritis in the right knee, and that she had suffered a trauma in that knee when she injured herself in 2005. (See Tr. at 462, 465). He concluded that Lerma appeared to experience pain in her knee, with weight bearing, but that she was able to walk without the assistance of a cane or crutch. (Tr. at 466). He also observed that she did not demonstrate any mental or emotional changes during the visit. (*Id.*).

On September 20, 2013, Plaintiff again saw Dr. Shamim. (Tr. at 499-505). Lerma told Dr. Shamim that she had been worrying about her incarcerated sons, and that she missed her deceased son. (Tr. at 500). Plaintiff said that her work distracted her from anxiety. She also said that she had been using Trazadone to treat her insomnia, and that it had been effective. Dr. Shamim observed that

Lerma appeared to be very tearful during their session, but that her thought process was linear and logical. (Tr. at 500, 503). Dr. Shamim instructed Plaintiff to continue taking Paxil, to treat her depression, and Trazodone and Hydroxyzine, to treat her insomnia and anxiety. (Tr. at 504). He also suggested that Lerma start writing in a journal, and that she return in two months. (Tr. at 500, 504).

On September 23, 2013, Dr. Andrea Pellegrini, Psy.D. ["Dr. Pellegrini"], a licensed psychologist, acting on behalf of the state, performed a mental status exam on Lerma. (Tr. at 470-74). Plaintiff told Dr. Pellegrini that she had a long history of physical, emotional, and sexual abuse. (Tr. at 470). She said that she had been physically abused by her mother, when she was a child. She said that she had been sexually abused at age fifteen, and that she became pregnant. (*Id*.). Lerma stated that she was forced to marry the man who violated her, because her mother would not allow her to return home. She remained married for thirty years, and claims that she was abused by her husband throughout the marriage. (*Id*.). Plaintiff said that she had been diagnosed with depression in 2010. (Tr. at 471). She reported that she has difficulty in focusing, concentrating, completing tasks, and remembering things. She also complained that she cries frequently; that she has difficulty in sleeping soundly; and that she frequently relives episodes of past abuse. (*Id*.). She also said that she felt sad, hopeless, anxious, and that she "[did] not find enjoyment in anything." (*Id*.). Lerma denied experiencing any hallucinations, delusions, suicidal or homicidal ideations or attempts. (Tr. at 471, 473). However, she admitted that she often contemplates "letting go of the steering wheel when [she] driv[es] over bridges." (Tr. at 471, 473). She told Dr. Pellegrini that she sees a therapist, and that she had been prescribed Paroxetine, Hydroxyzine, and Trazodone, to treat her depression and anxiety. (Tr. at 471). Plaintiff stated that her daily activities included "crafts, like making jewelry, [and] sewing." (Tr. at 472). She added that she is able to independently bathe, clean,

prepare simple meals, manage her finances, and utilize 911 in emergency situations. (*Id*.). Dr. Pellegrini observed that Lerma appeared to be anxious, depressed, and tearful, but that she was cooperative. (Tr. at 472, 473). She added that rapport was established, despite Plaintiff's visible emotional distress. (Tr. at 472). She noted that Lerma's thought processes were slowed, but goal oriented and logical. Plaintiff's concentration and attention were fair, and her judgment appeared to be adequate. (Tr. at 473). Ultimately, Dr. Pellegrini diagnosed Lerma as suffering from major depressive disorder, recurrent, severe, without psychotic features, and chronic post traumatic stress disorder. (Tr. at 474). She noted that Lerma had a number of psychosocial stressors, including occupational, housing, and economic problems. (*Id*.). On that date, she ascribed a GAF score of 53 to Lerma. She also concluded that, if assigned benefits, she would "be able to manage benefit payments in her own best interest." (*Id*.).

Plaintiff had another appointment with Dr. Shamim on January 3, 2014. (Tr. at 493-98). She reported that she had been working three days a week, and that she had been functioning well while on duty. (Tr. at 494). She said that she cared for her three puppies, on her off days. Lerma told Dr. Shamim that the winter holidays marked the anniversary of her son's death, but that she had not visited his grave that year. (*Id*.). She explained that she "[could not] handle [her] feelings any more." (*Id*.). She added that she had been eating and sleeping well. Dr. Shamim instructed Plaintiff to continue taking Paxil, to treat her depression, and Trazodone and Hydroxyzine to treat her insomnia and anxiety. (Tr. at 497). She also advised Plaintiff of the importance of a balanced diet, exercise and participating in structured daily activities. She then recommended that Lerma return for a follow-up appointment in six months. (*Id*.).

On June 9, 2014, Lerma returned to the MLK Center for an evaluation of her hypertension

and diabetes. (Tr. at 479-85). She complained of numbness in her fingers, as well as dizziness. (Tr. at 480, 481, 482). She denied experiencing any headache, chest pain, dyspnea, or edema, and she stated that she had been compliant with her medications. (Tr. at 481). Lerma's blood pressure, glucose, and cholesterol levels each fell within the targeted range. (Tr. at 481-82). The physician noted that her mood, affect, behavior, judgment, and thought content were normal. (Tr. at 483). She then advised Plaintiff of the importance of a low cholesterol diet, weight control, daily exercise, home glucose monitoring, foot care, and annual eye examinations. (Tr. at 485). Lerma was then referred to the Diabetic Education department, and she was instructed to schedule a follow-up appointment in one month. (*Id.*).

### Educational History, Background and Present Age

At the time of the administrative hearing, Plaintiff was 60 years old. (Tr. at 28, 226). She had a fifth grade education, and her past relevant work included her job as a sales attendant. (Tr. at 17, 28, 230). She testified that she is unable to sustain full-time employment, due to pain in her right knee. (*See* Tr. at 34). Plaintiff explained that the pain prevents her from standing for extended periods. (*Id.*). She stated that she works part-time as a fitting room assistant, but that she is only able to do so, because she is permitted to sit during her shift. (Tr. at 28, 32, 33).


### Subjective Complaints

In her applications for benefits, Lerma reported that she suffers from high blood pressure, high cholesterol, diabetes, anxiety, depression, and insomnia. (Tr. at 229). She also reported symptoms including blurry vision, difficulty kneeling, memory loss, severe headache, dyspnea, and difficulty in concentrating. (Tr. at 234). She claims that she can walk only one block, before she

must stop and rest. (Tr. at 240). She said that she can stand for one hour, before she must rest. She also said that she can perform some housework, but that she cannot mop, because it hurts her back and knees. (*Id*.). Lerma described her pain as "aching," and stated that it is continuous. (Tr. at 243). She explained that the pain usually begins after being on her feet "too long" at work, and that it did not subside until she laid down. (*Id*.). She reported that she had been prescribed Trazadone, Hydroxyzine, Metformin, Paroxetine, Enalapril, Hydrochlorothiazide for her pain, but that the medications did not provide any relief. (Tr. at 244, 245). She complained that the medications caused nausea and dizziness, instead. (*Id*.).

At the hearing, Lerma testified to the severity and debilitating effects of the impairments from which she suffers. (Tr. at 32-40). Plaintiff stated that she struggles with anxiety and depression. (Tr. at 35). She said that she is unable to work on weekends, because she is "very antsy" around large groups of people. (*Id*.). She explained that her anxiety manifests as a "scratching [feeling in her] hands[,] like [] a mosquito bite[.] " (Tr. at 35-36). Lerma told the ALJ that she had been prescribed medication for her anxiety, but that it causes severe drowsiness, lethargy, and difficulty in her concentration and memory. (Tr. at 36). Plaintiff said that her depression began in 2007, after her son's death. She reported that she has trouble sleeping, and that she sleeps about six hours, each night. (Tr. at 37). She stated that she visits a therapist, monthly, and that she takes medication to treat her depression. She said that her depressive symptoms had subsided with treatment. (*Id*.).

Plaintiff also reported that she suffers from severe pain in her right knee. (Tr. at 34). She explained that she twisted her knee in an accident at her previous job. (*Id*.). She stated that she attended one year of physical therapy, but that she had not had surgery to treat her injury. (Tr. at 35). Lerma said that she can stand for approximately two to three hours before experiencing knee pain.

She said that, at times, she has had to ask for a break, because of her pain. (*Id*.). She added that her pain prevents her from walking long distances and sitting for extended periods. (Tr. at 39).

Lerma testified that she currently lives with her daughter. (Tr. at 37). She said that she performs housework, but that she must "[complete] it in stages[.]" (*Id*.). She explained that she is able to wash, cook, and clean, but that, in order to do so, she minimizes the amount of time that she spends standing, and "takes [her] time" performing each task. (*Id*.). She added that she sews in her free time. (Tr. at 38). Plaintiff told the ALJ that she does not pay her own bills, do any shopping, or attend church or social events. (*Id*.). She explained that she "do[es]n't like to [] go to the front [of the house], because [she] feel[s] [like people] are watching [her.]" (*Id*.).

### Expert Testimony

The ALJ also heard testimony from Dr. Nancy Tarrand, a medical expert witness. (Tr. at 40-42). After reviewing the medical records, Dr. Tarrand stated that Lerma had been suffering from depression and chronic post-traumatic stress disorder, but that her symptoms had not reached a level of severity that met, or equaled the medical criteria for any disabling impairment in the applicable SSA regulations. (Tr. at 41). She told the that ALJ that Plaintiff exhibited some symptoms of depression, including anhedonia, insomnia, and low energy levels. (*Id*.). She also said that Lerma had expressed some feelings of low self-esteem, but that she had not indicated that she felt guilt or worthlessness. (*Id*.). Dr. Tarrand conceded that Plaintiff had mild restrictions in her activities of daily living and social functioning, as well as moderate difficulty with concentration, persistence, and pace. (*Id*.). However, she observed that Lerma had not experienced any episodes of decompensation. Dr. Tarrand also testified that she believed that Lerma may have exaggerated the severity of her symptoms. (Tr. at 41-42).

The ALJ later heard testimony from Mr. Herman Litt, a vocational expert witness. (Tr. at 42-44). He characterized Lerma's prior work experience, as a sales attendant, as "light," in exertional level, and "unskilled." (Tr. at 16, 43). Following his summary, the ALJ posed the following question to Mr. Litt:

> Q [B]ased on her age, education, and past work experience, assume I find [that] she is relegated to the light level, carrying up to 20 pounds, 10 pounds frequently; no climbing ladders, ropes, or scaffolds; occasional ramps and stairs, kneeling and crawling. She can understand, remember, and carry out simple instructions, make simple, work-related decisions, respond appropriately to supervisors, coworkers [sic], and the public; respond appropriately to usual work situations and changes in routine work setting appropriately, and attend and concentrate for extended periods. Could she do her past relevant work?
>
> A Yes, sir.

(Tr. at 43-44). Lerma's attorney then cross-examined the vocational expert witness, asking the following questions.

> Q If the individual were, due to mental health issues, [] off-task for a period of 20 to 30 percent of the day, would that individual be able to maintain any kind of job?
>
> A No.
>
> Q And currently she is working four hours a day with accommodations. If that were to go to eight hours a day, she may need additional unscheduled breaks, including three to four unscheduled on top of what was already allotted, [] would that be an accommodation that would be able to be made[?]
>
> A No, it wouldn't.

(Tr. at 44).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence. From his review of

the evidence, he determined that Lerma suffers from "degenerative joint disease of the right knee, major depressive disorder, post-traumatic stress disorder, diabetes, hypertension, and morbid obesity." (Tr. at 10). Next, he found that Plaintiff's medically determinable hepatic lobe mass, cholelithiasis, and hyperlipidemia were not severe impairments. (Tr. at 11). He further found that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations. (*Id.*). The ALJ then assessed Lerma's residual functional capacity and found that she has the RFC to perform "light work," as defined by the Act. That is, she can:

> lift and carry 20 pounds occasionally and 10 pounds frequently[,] sit for about six hours out of an eight-hour workday[,] and stand and walk for six hours out of an eight-hour workday[,] except she cannot climb ladders[,] ropes[,] or scaffolds. She can occasionally climb ramps and stairs. She can occasionally kneel and crawl. [She] can understand, remember, and carry out simple instructions; make simple work-related decisions; and respond appropriately to supervis[ors], co-workers, [the] public and [typical] work situations. She is able to handle changes in work routine [and] setting[s] and attend concentrat[ion] for extended periods.

(Tr. at 13). The ALJ concluded that, while Lerma's impairments could reasonably be expected to cause the alleged symptoms, her testimony regarding the limiting effects of her conditions is inconsistent with the RFC assessment. (*Id.*). Based on the medical records and the testimony from Mr. Litt and Dr. Tarrand, the ALJ determined that Lerma is capable of performing her past relevant work as a sales attendant. (Tr. at 14-16). For these reasons, the ALJ concluded that Lerma is "not [] under a 'disability,' as defined in the Act," and he denied her applications for benefits. (Tr. at 16). That decision prompted Plaintiff's request for judicial review.

In this action, Plaintiff complains that the ALJ erred at step four of his analysis. Lerma contends, in particular, that the ALJ failed to make findings of fact regarding the physical and mental demands of her past work as a sales attendant. (Plaintiff's Motion at 5–6). She also alleges

that the ALJ failed to ask the vocational expert if his testimony was consistent with the Dictionary of Occupational Titles ["DOT"]. (*Id*. at 7-8). Next, Plaintiff insists that she cannot perform her past work, as it is generally performed, because she cannot meet the standing, walking, or mental requirements of a "sales attendant," as the job is described in the DOT. (*Id*. at 8-10). Finally, Plaintiff claims that the ALJ failed to consider a letter from her part-time employer, which states that she is able to work only because of an accommodation. (*Id*. at 11-12).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers v. Apfel*, 238 F.3d 617, 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id*. A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

### Step Four Analysis

At step four of the disability analysis, a claimant must be found not disabled if she is able to perform her past relevant work. 20 C.F.R. § 404.1520(f). "While an ALJ has a duty to make a sufficient inquiry into the claim, [] it is an applicant's burden to prove an inability to perform former work." *Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990). Nevertheless, to determine whether a claimant can perform her past relevant work, the ALJ is required to assess the physical demands of that work. *Orphey v. Massanari*, No. 00-31478, 2011 WL 877596, at *1 (5th Cir. 2001) (citing *Villa*, 895 F.2d at 1022). This finding may rest on descriptions of past work as it was actually performed, or as it is generally performed in the national economy. *Id.* (citation omitted). In making

this assessment, the ALJ may consider the claimant's testimony, the vocational expert's testimony, or the Dictionary of Occupational Titles ["DOT"], as well as its companion volumes and supplements. 20 C.F.R. § 404.1560(b)(2).

### *Findings of Fact*

Plaintiff complains that the ALJ erred by failing to make specific findings of fact regarding the physical and mental demands of her past work as a sales attendant. (Plaintiff's Motion at 5–6). "'[W]hen making a finding that an applicant can return to [her] prior work, the ALJ must directly compare the applicant's remaining functional capabilities with the physical and mental demands of [her] previous work.'" *Garcia v. Colvin*, No. V-12-050, 2013 WL 1932851, at *10 (S.D. Tex. May 8, 2013) (quoting *Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir. 1994). The ALJ must also make "clear factual findings on that issue, and may not rely on generic classifications of previous jobs." *Id.* (internal citations omitted); *see also* SSR No. 82-61 (C.E. 1982), 1982 WL 31387. An ALJ may properly rely on the testimony and conclusions from a vocational expert witness, that a claimant is capable of performing a particular job. *Carey v. Apfel,* 230 F.3d 131, 145 (5th Cir. 2000); *see Leggett*, 67 F.3d at 565.

In his decision, the ALJ relied on the testimony of the vocational expert witness, Mr. Herman Litt, in determining that Plaintiff "is capable of performing past relevant work as a sales attendant." (Tr. at 16). The ALJ noted that Mr. Litt identified Lerma's past relevant work as a sales attendant, DOT code 299.677-010, and that the code described that position as "light and unskilled[.]" (*Id.*). He explained that Mr. Litt testified that "an individual with [Lerma's] residual functional capacity is capable of performing the work of a sales attendant." (*Id.*). The ALJ agreed with the vocational expert, and ultimately found that Plaintiff is capable of performing her past work. (*Id.*). The

vocational expert witness was present during the hearing and was familiar with Plaintiff's prior work and current functional limitations. It is clear that the ALJ properly relied on the testimony from Mr. Litt, which was given in response to a hypothetical question, that contained limitations based on of the evidence of record. *Hickley v. Astrue*, No., 2010 WL 3835113, at * 6 (N.D. Tex. Aug. 2, 2010). On this record, the ALJ made sufficient findings of fact concerning Plaintiff's ability to perform the duties required by the sales attendant job. *Deleon v. Colvin*, No. 7:14-CV-340, 2015 WL 12552003, at *20 (S.D. Tex. Sept. 22, 2015) (ALJ findings of fact adequate when he relied on vocational expert witness testimony to find that claimant retained RFC to perform past work). On this point, the ALJ did not err.

### *Vocational Expert Testimony Regarding Performance of Work as Sales Attendant Work*

Next, Lerma argues that the ALJ failed to confirm that the vocational expert witness' testimony is consistent with the DOT. (Plaintiff's Motion at 7-9). She maintains that she was prejudiced by this error, because there are "several facial inconsistencies between the vocational expert's testimony and the DOT." (*Id*. at 8). In support of her argument, Plaintiff contends, first, that she cannot perform work as a sales attendant, as described in the DOT, due to her standing and walking limitations. (*Id*. at 8-11). She argues, specifically, that her RFC limits her to "standing and walking for six hours a day[,]" and that no tasks listed in DOT's position description can be performed while seated. (*Id*. at 8-9). She also claims that the mental acuity required of a sales attendant are beyond her residual functional capacity, which is limited to following simple instructions and making simple work-related decisions. (*Id*. at 9-10).

It is well established that an agency must follow its own procedures. *Newton*, 209 F.3d at 459 (citing *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)). Nevertheless, an administrative

decision will not be overturned for merely a procedural violation. *Id.* Rather, if an agency "violate[s] its rules and prejudice result[s], the proceedings are tainted and any actions resulting from the proceeding cannot stand." *Hall*, 660 F.2d at 119. In a social security benefits case, an individual establishes prejudice by showing that, absent the violation, a different result might have been reached. *See Ripley*, 67 F.3d at 557.

Under the Regulations, "[o]ccupational evidence provided by a [vocational expert] [] generally should be consistent with the occupational information supplied by the DOT." No. SSR 00-4p (C.E. 2000), 2000 WL 189870. However, the DOT merely "gives a general description of the duties involved," while "[t]he value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *See Fields v. Bowen*, 805 F.2d 1168, 1170-71 (5th Cir. 1986); *Carey*, 230 F.3d at 145. An ALJ may rely on the vocational expert witness' testimony if the hypothetical question reasonably incorporates all of the claimant's disabilities that are recognized by the ALJ, and the claimant has an opportunity to correct any deficiencies in the ALJ's question. *Slaughter v. Astrue,* 857 F.Supp.2d 631, 645 (S.D. Tex. Mar. 8, 2012). "[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey*, 230 F.3d at 146-47.

On this record, the ALJ's failure to explicitly confirm that the vocational expert witness' testimony was consistent with the DOT did not prejudice Plaintiff. The DOT provides that a "sales attendant" may perform *any combination* of the following duties:

"Aids customers in locating merchandise. Answers questions from and provides information to customer about merchandise for sale. Obtains merchandise from stockroom when merchandise is not on floor. Arranges stock on shelves or racks in sales area. Directs or escorts customer to fitting or dressing rooms or to cashier. Keeps merchandise in order. Marks or tickets merchandise. Inventories stocks.

Dictionary of Occupational Titles, Code 299.677-010, http://www.occupationalinfo.org/29/299677010.html, last visited June 9, 2017. At the hearing, the vocational expert witness cited the DOT, explicitly, when equating Plaintiff's past work with that of a sales attendant. The ALJ then posed a hypothetical describing Lerma's RFC, which provided for her standing, walking, and mental deficiencies. The witness considered those limitations, and determined that Plaintiff could perform her past work. It is reasonable to conclude, then, that Mr. Litt considered the DOT's occupational requirements for a sales attendant, and, nevertheless, found that Lerma could maintain her past employment. *See* Social Security Ruling 00-4p, 2000 WL 1898704 at *3 (Dec. 4, 2000) ("the DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings."). To the extent there is any implied or indirect conflict between the vocational expert's testimony and the DOT, the ALJ appropriately gave greater weight to the vocational expert's testimony. *Carey*, 230 F.3d at 146.

Moreover, Plaintiff's attorney had the opportunity to present additional hypothetical questions, and to cross examine Mr. Litt about Plaintiff's ability to perform her past work. However, Lerma's attorney did not question Mr. Litt about how Lerma's knee pain might affect her ability to work. (Tr. at 44). Nor did she inquire about how Plaintiff's inability to follow detailed instructions might prevent her from working as a sales attendant. Plaintiff wholly failed to present evidence to show that she could not perform her past work. *Crowley v. Apfel*, 197 F.3d 198 (5th Cir. 1999) (a

claimant has the burden to prove that she cannot perform the jobs set out by the vocational expert). On this record, the ALJ properly determined that Lerma was not disabled under the Act.

### Lay Opinion

Plaintiff also contends that the ALJ disregarded the opinion from her employer, which outlined the severity of her standing limitation. (Plaintiff's Motion at 11-12). In making a disability determination, an ALJ may consider opinions from "other non-medical source[s]," including spouses, parents, caregivers, siblings, other relatives, friends, neighbors, and clergy. 20 C.F.R. § 404.1513(d)(4). Information from "other non-medical source[s]" may be used only to provide insight into the severity of the claimant's impairment, and how the impairment affects the claimant's ability to function. *Id.* While an ALJ need not discuss every item of evidence in the record, he may not ignore evidence that does not support his decision. *Jefferson v. Barnhart*, 356 F.Supp.2d 663, 675 (S.D. Tex. 2004). Ultimately, the ALJ has "sole responsibility for determining a claimant's disability status." *Newton*, 209 F.3d at 455 (*quoting Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)).

In this case, the ALJ found that the evidence from Plaintiff's physicians revealed "few clinical abnormalities stemming from her severe physical impairments." (Tr. at 14). The correspondence from Lerma's employer, alone, cannot establish that her knee impairment was so severe that it rendered her disabled. Indeed, the employer's statement is simply a lay opinion that must be considered in the ALJ's determination of whether a claimant is disabled under the Act. *See* 20 C.F.R. §§ 404.1527(b), 404.1527(d)(2). As such, the ALJ made no error in failing to mention the correspondence from Plaintiff's employer in his decision.

In sum, the ALJ made sufficient factual findings regarding Plaintiff's ability to perform her past work. He appropriately incorporated the standing, walking, and mental limitations from the

residual functional capacity assessment into the hypothetical question posed to the vocational expert witness. He then relied on that responsive testimony to determine that Lerma could perform her past work. The ALJ did not err in failing to explicitly discuss the opinion from Plaintiff's employer. For these reasons, Defendant's motion for summary judgment is granted, and Plaintiff's motion is denied.

**Conclusion**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment is **GRANTED**, and that Plaintiff's motion for summary judgment is **DENIED**.

**SIGNED** at Houston, Texas, this 12th day of June, 2017.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**